*582 OPINION OF THE COURT
Joseph Kevin McKay, J.
Defendant has moved pursuant to CPL 440.10 (1) (h)[1] to vacate the judgment of conviction against him for murder in the second degree and criminal possession of a weapon in the second degree rendered December 23, 1993, and for a new trial on the grounds that he was deprived of his constitutional right to a fair trial by virtue of ineffective assistance of trial counsel.
Defendant has already perfected his direct appeal in the Appellate Division, Second Department, which Court, having denied a motion to stay the appeal pending the determination of this CPL article 440 motion (by decision and order dated July 19, 1995), affirmed the judgment of conviction by a decision and order of December 11, 1995 (People v Smith, 222 AD2d 535 [2d Dept 1995]). That decision found that the evidence was legally sufficient to establish defendant’s guilt beyond a reasonable doubt and that the verdict of guilt was not against the weight of the evidence.
The defendant’s direct appeal also included the issue of ineffective assistance of counsel, which was rejected by the Appellate Division in the following language: "Based on the record before us, the defendant was afforded meaningful representation under the totality of the circumstances then existing (see, People v Flores, 84 NY2d 184, 187 * * *).” (Supra, at 535.)
Prior to this affirmance, the trial court ordered an evidentiary hearing on this CPL article 440 motion, which was held in November 1995. Defendant was present for every evidentiary session of the hearing and testified in his own behalf. The defense also called defendant’s mother and an investigator. The prosecution called defendant’s trial counsel, Herbert M. Feinsod (hereinafter referred to as counsel), as their only witness. In addition, there was a report received into evidence by stipulation of Morris S. Zedeck, Ph.D., a pharmacologist, dated October 3, 1994, regarding the side effects that counsel was likely to have suffered on account of the various medications he was taking during the trial, which included the concession that Dr. Zedeck was not a physician and never examined *583 counsel or any medical records and that he could not determine whether, in fact, he had experienced any of these side effects.[2]
In accordance with the requirements of CPL 440.30 (7), I now make findings of fact and conclusions of law. In doing so, I recognize that defendant must prove every fact essential to support his motion by a preponderance of the evidence. (See, CPL 440.30 [6].) Moreover, not only am I bound by the recent decision of the Appellate Division, but also I must not consider matters in the original trial record which were or could have been raised on direct appeal. (CPL 440.10 [2] [a], [b], [c]; People v Cooks, 113 AD2d 975, 976 [3d Dept 1985], affd 67 NY2d 100 [1986]; People v Castaneda, 189 AD2d 890 [2d Dept 1993], on remand 198 AD2d 292, lv denied 83 NY2d 870 [1994].) This is more than an academic restriction in this case because defendant unsuccessfully raised the same issue of ineffective assistance of counsel on direct appeal, as previously noted.[3]
Each of the hearing witnesses, with the exception of the investigator, whose testimony I take to be only marginally relevant in any event, carried some heavy credibility baggage on account of their interests in the outcome of this proceeding. Defendant’s mother is bitterly disappointed over the imprisoned fate of her beloved son. The defendant himself has the biggest stake and in many (but not all) important respects I found his testimony as incredible as the jury at trial presumably did. Finally, trial counsel was placed in the extremely awkward position of explaining his less than exemplary performance at trial and at the same time of answering sexual harassment and conflict of interest charges based on his relationship with and conduct toward defendant’s mother.[4]
Counsel performed some of his professional duties toward defendant acceptably well and others deficiently. He entered the case at the behest of defendant’s mother, who feared at that point as much for his safety on the street as for his prosecution for homicide. He properly arranged for a peaceful surrender of defendant to the police in his mother’s home, instructed the *584 police not to question his client, instructed the police not to put him in a lineup without first consulting him (which the police ignored and for which counsel failed to pursue any remedy in a timely fashion),[5] 6and he took his photograph to assure his proper treatment at the hands of the police. These were all early duties of counsel which were helpful to defendant.
However, even at this early stage counsel fell short professionally in important respects. He seemed to have no sensitivity to the potential conflict of interest[6] he faced from the outset by representing the codefendant Fitzroy McNeil[7] at the same time during this early arrest process. While this was to be remedied shortly by the appointment of counsel from the 18-B homicide panel for McNeil in Criminal Court, the problem concerns counsel’s interview of both suspects at that time. A careful lawyer should have interviewed his client separately and limited his representation of McNeil to certain prophylactic instructions to the police, and certainly not engage in a joint interview of both, as counsel testified he did, or conduct any interview of McNeil without a clear, intelligent and voluntary waiver by McNeil and Smith of the potential conflict of interest. Not only was this apparently ignored by counsel, but he put himself in the position more than three years later of not being able to differentiate at the CPL article 440 hearing who told him what about the facts of the homicide, at least at this early stage.[8]
The next factual category outside the record I will characterize as factual preparation for trial. Based on counsel’s inconsistent testimony and his complete inability to produce any notes or other supporting documentation, I find that he did not properly investigate the scene of the homicide, either himself *585 or by means of an investigator. (See generally, People v Bennett, 29 NY2d 462, 466-467 [1972]; People v Droz, 39 NY2d 457 [1976].) If he ever went back to that housing project after the day of surrender, which I doubt, it was a useless venture, since he obviously learned nothing about the scene of the homicide which he was later able to use at trial or explain at the 440 hearing. This is one area where investigator Collins’ testimony is relevant. He demonstrated that it would have been helpful in cross-examining the People’s witnesses at trial to have independent investigative reports to compare with police reports, diagrams and ballistics evidence. For example, the presence of shells which might have come from two guns could have been pursued, as well as the lack of a direct path from the main entrance to the landing where the shooting occurred and damage to walls that arguably was consistent with a "shoot-out.”[9]
I find that counsel imprudently failed to hire an investigator to help him prepare for trial. Even if defendant and his mother had not asked him to do so, although I believe they did, it should have been done. It is no answer to say, as counsel testified, that he relied on McNeil’s counsel to do so, because it is not other counsel’s responsibility toward defendant Smith and because there was no follow-up by counsel to ensure that it was accomplished.
An investigator, while not necessarily essential, would surely have been also helpful in canvassing for witnesses and interviewing those whose names were given to counsel by defendant and his mother. I do accept counsel’s testimony that he contacted a person at the Pierre Hotel where Smith had been working and the housing project manager where Smith lived, with essentially negative results. Moreover, I agree with the prosecution that the defense did not prove the existence of witnesses favorable to the defense whom counsel failed to produce for trial, except insofar as the defense could have been more diligent and potentially successful in making offers of proof to the trial court of the violent reputation and prior violent acts of and threats by the deceased. (See generally, People v Miller, 39 NY2d 543 [1976]; People v Ross, 197 AD2d 713 [2d *586 Dept 1993], lv denied 82 NY2d 902 [1993].)[10] Finally, I see no reason why counsel did not at least attempt to interview Kizer Gables, a witness mentioned by the key prosecution witness, Deshawn Livingston,* [11] as being present outside the building at or about the time of the shooting, who refused to speak with the District Attorney.[12]
With respect to counsel’s interviews of defendant, I believe the truth to lie somewhere in the middle of the exaggerated versions given by defendant and counsel. He spoke with defendant from time to time in connection with his various court appearances and on occasion briefly by telephone, but failed to listen fully, patiently and attentively to his client’s concerns and failed to inform him in greater detail of the progress of the case, if any, and planned trial strategy. Above all, as will be discussed later in this opinion, counsel failed to advise Smith properly concerning his right to testify or not, and failed to prepare him as a witness.
Counsel testified at the 440 hearing that Smith told him from the beginning that he and McNeil had heard that Michael Livingston (the deceased) wanted to talk to them and that he was waiting for them in the stairwell at 157 Belmont Avenue with a gun.[13] The defendant and McNeil also wanted to talk to Michael and come to some peaceful meeting of the minds, but they knew about Michael’s reputation as neighborhood drug dealer, terrorist, and killer. Smith further recounted that on the day of the shooting (July 26, 1992) he and McNeil walked up the stairs at 157 Belmont Avenue, the scene of the homicide. One of them was carrying a Tec-9, a big gun that is *587 difficult to conceal. Counsel testified that he did not remember if he was told which one had the gun, and he did not know if the defendant told him that the weapon was brandished. Counsel was also told that Michael Livingston was waiting for them at the top of the third floor stairwell with a Mac-11, a small Uzi-like gun and that Michael Livingston pointed the Mac-11 at them and fired. Smith or McNeil returned fire with the Tec-9 and hit Michael Livingston. Smith and McNeil immediately left the scene after shooting Michael Livingston.
Notwithstanding Smith’s denial at the 440 hearing, I find that Smith did in fact make these statements to counsel early in the case.[14] Moreover, it is clear from the entire 440 record, supported by and consistent with the trial record, that counsel rejected justification based on these facts as a potential avenue of defense, more or less summarily, that is, without sufficient and appropriate factual and legal research. I found counsel unconvincing when he attempted to recollect and explain his legal analysis of this "justification” account of events, as well as how much discussion he had with Smith and what advice he gave to him concerning that version of events. While claiming on the one hand that these facts presented him with a "dilemma”, which he did not discuss with Smith, at the same time he stated that he told Smith his conduct could not be justified.[15] Since I have thoroughly discounted defendant’s own testimony on the subject, I must rely exclusively on counsel’s evidence, but I do not necessarily accept everything he has said about it.[16]
*588 Regarding the potential defense of justification, as it impacts on the issue of effective assistance of trial counsel, the prosecution has argued that under the facts given by Smith to counsel before trial, justification was unavailable as a matter of law. The People reason, in defense of trial counsel’s decision to reject justification, that the approach of Smith and McNeil, armed with a loaded weapon, toward the deceased, even with the purpose of settling a dispute peacefully, by itself precludes a justification defense on account of the duty to retreat. (Penal" Law § 35.15 [2] [a].) In other words, once defendant is armed with a deadly weapon and enters the presence of the deceased, he has failed in his duty to retreat because he could have avoided the confrontation in complete (albeit perhaps temporary) safety by not going to see the deceased in the first place. It does not matter, the argument goes, how the actual violence starts or who shoots or threatens first or even whether at the time of this confrontation the defendant cannot then retreat with complete safety to himself and others.
The cases cited by the prosecution, however, do not stand for such a broad proposition. Rather, the authorities are uniform in holding that where there exists an earlier dispute, conflict or threat, it is still what happens at the second confrontation that determines whether justification is available as a defense, including whether there is a duty to retreat and whether that can be done with complete safety. (People v Casado, 177 AD2d 497 [2d Dept 1991], lv denied 79 NY2d 854 [1992] [justification charge properly denied when defendant shot unarmed victim and eyewitnesses did not see victim take any aggressive action]; People v Brown, 187 AD2d 312 [1st Dept 1992], lv denied 81 NY2d 837 [1993] [justification charge given to jury and disproved beyond a reasonable doubt where defendant had the only gun which he claimed deceased tried to grab during struggle]; People v Reyes, 116 AD2d 602 [2d Dept 1986], lv denied 67 NY2d 949 [1986] [justification considered at bench trial but disproved because defendant could have withdrawn from second encounter in complete safety]; People v Mungin, 106 AD2d 519 [2d Dept 1984] [no justification available as a matter of law when defendant returns to the victim after first altercation armed with a shotgun and shoots victim who may have reached for a knife — because defendant concededly had ability to withdraw and retreat]; see also, Matter of Y. K., 87 NY2d 430, 434 [reversal of conviction affirmed because trial *589 court erroneously held that respondent failed in her duty to retreat after initial attack, whereas, according to both appellate courts, her duty to retreat "did not arise until the point at which deadly physical force was used or imminent”].)
In my view, justification was a potential defense in this case, based on the scenario first given to trial counsel, but with some formidable problems to be faced, such as the missing second gun and the nature of the wounds inflicted on the deceased. I believe it was wrong for trial counsel to reject this potential defense summarily and prematurely, as he obviously did. The District Attorney’s belated research, which I do not believe reflects the efforts of trial counsel, does not persuade me otherwise. (See, DeLuca v Lord, 77 F3d 578 [2d Cir 1996].)
I conclude that if the defendant testified to the account I believe he gave to counsel or in some other way offered evidence of a "shoot-out” and requested a justification charge to the jury, such a charge would and should have been given. Nevertheless, on this record I find it difficult to gauge how the jury would have reacted to this defense in light of the other evidence at trial, including the number and nature of the deceased’s gunshot wounds, particularly the bullet half-exiting from the side of his head. Surely, the evidence at the trial would have been sufficient for the jury to have found that this defense was not applicable or was disproven beyond a reasonable doubt.[17] But this does not end the analysis or eliminate this aspect of Smith’s 440 claim because the evidentiary record for the defense on this issue was never developed, due to counsel’s ineptitude before and during trial.
The greatest fault with counsel’s communication or lack of it with his client centers around defendant’s testimony at trial. Consistent with the trial record, the 440 hearing establishes that the decision to call defendant as a trial witness was an abrupt and radical change of plans made at the close of the
*590 People’s case,[18] undertaken, as the People now concede, without any immediate preparation by counsel of his client. In a murder case this could come perilously close to the type of substantial blunder or per se ineffectiveness of counsel as to warrant the granting of CPL article 440 relief. (See, People v Flores, 84 NY2d 184,188 [1994], supra; People v Hobot, 84 NY2d 1021, 1022 [1995]; compare, Tippins v Walker, 77 F3d 682 [2d Cir 1996].) Indeed, the prosecution conceded during the final argument of this motion that, as counsel hesitantly stated during the 440 hearing, the content of defendant’s testimony was a surprise to counsel.[19]
Taking counsel’s evidence on this subject at face value, it means that, without any question and answer preparation of defendant for direct and cross-examination, and after telling the defendant all along that it was inadvisable and most unlikely that he would testify at trial, and after completely rejecting the justification defense and completely failing to pursue any investigative efforts or offers of proof to enhance the justification defense, counsel abruptly called his client to testify — expecting him to give the "justification” version to the jury, that is, to admit to the shooting albeit in self-defense. *591 This conduct by counsel, if that is really what took place, would also come perilously close to, if not cross the line of "the substantial blunder” which would require a new trial.
In addition to claiming this lack of preparation, the defense also asserts that Smith did not know of his right not to testify. I do not wholly accept defendant’s testimony and contention on this issue. After all, Smith, a reasonably intelligent young man, was present during his Sandoval hearing and that of McNeil, at jury selection when counsel raised that issue, and he also had participated in an earlier jury trial with the same trial counsel at which he did not testify, on advice of counsel, which ended in a hung jury. He therefore knew of his rights and, in that sense, let counsel make the decision for him. I believe, however, especially in light of the abrupt way it occurred, without any immediate discussion or preparation, that counsel bears responsibility for unduly usurping that decision-making role in which Smith acquiesced. In other words, he failed to convey, clearly and carefully, to Smith that it was Smith’s, not counsel’s ultimate decision. (See, Jones v Barnes, 463 US 745 [1983]; People v Ferguson, 67 NY2d 383, 390 [1986].) In fact, counsel testified at the 440 hearing that it was probably his, not Smith’s decision, and that it was his one big mistake at trial.[20] This means that the People’s own (and only) witness supports the defense on this critical point. (See also, People v Petrovich, 87 NY2d 961.) This in itself is an abridgement by counsel of one of Smith’s fundamental rights under the Sixth Amendment, constituting another instance of counsel’s deficient performance and less than meaningful representation. (See, Rock v Arkansas, 483 US 44 [1987]; United States v Teague, 953 F2d 1525 [11th Cir 1992], cert denied 506 US 842 [1992]; People v Ferguson, supra)[21]
Defendant testified at the 440 hearing to his "alibi”/denial version of events and even stated at one point that after hav *592 ing new counsel and given all the posttrial time he had to reflect, he would testify at any subsequent trial (if one were ordered and he took the stand) the same way as he did on the first trial. If that is so, how can he claim actual prejudice? (See, People v Sullivan, 153 AD2d 223 [2d Dept 1990], lv denied 75 NY2d 925 [1990]; People v Daley, 172 AD2d 619 [2d Dept 1991].)
It may well be the case that Smith has seriously jeopardized his ability to present a justification defense — especially through his own testimony — not only at trial but by reaffirming that testimony at his 440 hearing with new counsel. It may be equally true that in the same breath, so to speak, Smith has diluted the prejudice he may claim resulting from his trial counsel’s failure to develop and present a justification defense.
Of course, these circumstances do not create in any sense a forfeiture of Smith’s constitutional right to the effective assistance of counsel at his trial. (See, People v Ofunniyin, 114 AD2d 1045 [2d Dept 1985].) From this 440 record, I find and conclude that he was not adequately advised of his right to raise justification, even as an inconsistent defense (see, People v Butts, 72 NY2d 746 [1988]), nor was he properly advised of his right to decide for himself not to testify at trial. Moreover, he received virtually no preparation by counsel to be a witness in his own behalf at trial. By his trial counsel’s over-all lack of investigation, poor preparation, failure to understand the facts and the law, and his failure to pursue a reasonable, consistent trial strategy,[22] counsel fell short of the required level of effective, meaningful representation. These circumstances, I hold, constitute cognizable, actual prejudice.
Measuring the extent of that prejudice by determining whether counsel’s deficiencies probably affected the outcome of the trial is not an easy task. (See, People v Margan, 157 AD2d 64, 66 [2d Dept 1990].) Counsel’s failure to pursue justification did prejudice Smith’s right to present that defense, even as one inconsistent with a "denial” defense. If raised, justification may also have enabled the defense to bring before the jury the violent reputation of the deceased. In addition, counsel’s other exposed deficiencies, catalogued in this decision, can be said to have had a probable effect on the outcome of this trial. His lack of sufficient preparation and investigation undermined his *593 ability to challenge the prosecution’s case and. the credibility of the People’s main witness more effectively. His inadequate advice to Smith about his testifying or not, and his failure to prepare him as a witness, if remedied, could have resulted in different testimony[23] or in the defendant’s more deliberate decision not to testify. I cannot say that these changes in the dynamics of the case would not have affected the outcome of the trial, where, as here, the prosecution’s evidence was not overwhelming. In the final analysis, even if the prejudice suffered is not found to have had a probable effect on the verdict, it is my judgment that Smith, on account of counsel’s less than meaningful representation, did not receive, and was thereby deprived of, a fair trial. (CPL 440.10 [1] [h]; People v Baldi, 54 NY2d 137, supra.)
Accordingly, the defendant Smith’s motion is granted, the judgment of conviction is vacated, and a new trial is ordered.

. The notice of motion also cited CPL 440.10 (1) (d), but this claim was abandoned.

. I find, based in part on my observations at trial as well as at the hearing, that none of these medications substantially interfered with counsel’s mental or physical abilities or rendered him ineffective.

. This restriction, however, in a case such as this one, makes the effective assistance of counsel under the totality of the circumstances, according to People v Baldi (54 NY2d 137 [1981]), more difficult to assess.

. Regarding those matters I find that any indiscretions that may have taken place arising out of a long and friendly as well as professional relationship did not constitute a cognizable conflict of interest which interfered with his duty to represent defendant at trial.

. See, People v Burts, 78 NY2d 20 (1991); People v LaClere, 76 NY2d 670 (1990); People v Wong, 223 AD2d 568 (2d Dept 1996).

. The Court of Appeals has held that the right to effective assistance of counsel "encompasses the right to conflict-free counsel” and counsel’s devotion to a client’s interest should be.....single-minded.” ’ ” (People v Ortiz, 76 NY2d 652, 656 [1990]; see also, People v Gomberg, 38 NY2d 307 [1975].) Nevertheless, there is no per se rule requiring reversal and defendant must meet the "heavy burden” to establish that his defense was in fact affected by any such conflict, although there is no requirement that a defendant demonstrate "specific prejudice.” (See, People v Ortiz, supra, at 657; People v Jordan, 83 NY2d 785, 787 [1994]; People v Winkler, 71 NY2d 592, 597 [1988].)

. McNeil was also convicted at trial and his appeal is pending in the Appellate Division.

. As will become clear in this decision, counsel was never able to state clearly a critical fact concerning whether his client at any time told him who had the gun and who fired the fatal shots at the deceased.

. This is not to say that any of these items alone would have raised a reasonable doubt, that is, probably affected the outcome of the trial and thus be grounds for 440 relief. Rather, it is part of what emerged as a pattern during the 440 hearing in the context of what I consider less than an overwhelming case for the prosecution at trial.

. In addition to counsel’s testimony, to be discussed hereafter in the context of the potential justification defense, Smith and his mother testified credibly about the deceased’s reputation for violence and prior specific acts of violence. However, the admissibility of this type of evidence would depend on the use of "justification,” to be discussed hereafter.

. There is also some evidence in the 440 record that an investigator may have been helpful in trying to interview Deshawn Livingston and possibly in developing information of prior bad acts to assist in cross-examination of Deshawn. However, I reject as farfetched and too speculative the allegation advanced by the defense in various ways during the 440 hearing that it was Deshawn who killed Michael Livingston.

. Kizer Gables was in custody at the time of trial and apparently available to be interviewed. There is no proof that he would have been helpful to the defense, but there appears to be no reason why this was not attempted and, despite counsel’s confused recollection and testimony on this point, it is unquestionable that no such attempt was made.

. This is consistent with a factual version I inferentially find was also given by codefendant McNeil to counsel.

. This is supported by counsel’s testimony, which I credit, that he obtained information about those two types of guns. Compare defendant’s 440 hearing testimony wherein he not only denied ever telling counsel this self-defense factual account, but he adopted his previous trial testimony, characterized by the prosecution as "alibi”, as the truth.

. Counsel testified at the hearing that he specifically told Smith "that I could not justify his going up the stairs to confront Livingston with a gun rather than walk away from it because that was not self-defense, that was not justification in any sense. Therein lay my dilemma.” At another point counsel testified that one would have to have his back to the wall to relieve him of his duty to retreat.

. It is very difficult to reconstruct from the 440 record precisely what advice about self-defense counsel gave to his client. If he did clearly advise him that self-defense was unavailable to him based on the aforesaid account of what happened, then it is likely that this advice must have influenced Smith, when he eventually testified at trial, to give a radically different version of his (non-)participation. It is difficult to extrapolate further from the 440 record without improper speculation, but I am left with an abiding conviction that an important piece of this factual puzzle may be missing as *588 to the events preceding what I believe was most likely Smith’s perjured trial testimony.

. It is also quite possible that even if the jury accepted the "shoot-out” theory as a factual matter, the jury might also have found that defendant failed in his duty to retreat when he put a bullet into the head of the deceased as he lay on the concrete floor — at a range close enough to get powder burns on the deceased’s hand with which he tried to protect himself from the fatal shot. It is regrettable that trial counsel appears to have misunderstood the significance of this most potent trial evidence. He testified at the 440 hearing that he never was able to determine whether this was an exit or entrance wound, evincing a critical lack of understanding of the prosecution’s evidence.

. The prosecution argues in its posthearing brief that this radical and abrupt change was justified, if not mandated, by the poor way the case had developed for the defense and by the overwhelming evidence presented by the prosecution. I disagree with the characterization of "overwhelming”, but, more importantly, it has never been satisfactorily explained to me what happened in the trial to create this situation. In other words, what was the unforeseen turn of events that prompted this radical change?

. Notwithstanding this concession, I am not convinced of the truth of that testimony. Interestingly, there was no sign, either at trial or during the 440 hearing, that counsel experienced any ethical dilemma on account of this surprise. (See, People v Appel, 120 AD2d 319 [3d Dept 1986], lv denied 69 NY2d 824 [1987]; see also, People v DeFreitas, 213 AD2d 96 [2d Dept 1995], lv denied 86 NY2d 872 [1995]; People v Diaz, 199 AD2d 182 [1st Dept 1993], lv denied 83 NY2d 804 [1994].) Counsel also testified at the 440 hearing that he could not recall the content of his client’s testimony at trial, even though he recalled quite vividly and almost boastfully that the jury told him afterwards they would have acquitted if defendant had not testified. While we must avoid, as counsel himself protested, making the 440 hearing a test of his memory of the trial record, this is to me a shocking memory failure, suggesting less than total candor on the subject. In other words, I believe it is more likely that counsel was aware before Smith testified that he would deny participation in the homicide. But if this is so, counsel would have been expected to advise Smith against possible perjury and not to testify at all if the truth would incriminate him. On this record I must conclude that counsel did not so advise Smith and, in fact, went a step further and made the equivalent of a "command” decision for him to testify, stating later at the 440 hearing, "[w]e had nothing to lose.”

. It is also troubling that in making this key decision counsel appears to have relied heavily on McNeil’s attorney’s advice, which may be at odds with the single-minded and independent judgment he should have exercised on behalf of Smith. In his affidavit of September 7, 1995, submitted by the prosecution in opposition to this 440 motion, he stated that "Mr. Stutman [McNeil’s attorney] then convinced me that Barry Smith should testify”.

. I am aware that this deprivation is not and should never become per se grounds for a new trial. The line between acquiescence by defendant and usurpation or coercion by counsel is usually, as here, blurred, not bright, and the risk of a "delayed-trigger weapon to be sprung at some later strategic phase of the proceeding” is ever-present. (People v Winkler, supra, 71 NY2d, at 598.) On this motion, however, I have detected no hint or possibility of collusion between Smith and his trial counsel regarding this issue.

. I cannot conclude that this is a case of second-guessing unsuccessful, but meaningful trial strategy, which is warned against in People v Satterfield (66 NY2d 796, 799-800 [1985]; see also, People v Tuzzio, 201 AD2d 595, 596-597 [2d Dept 1994], lv denied 83 NY2d 877 [1994]). Rather, I conclude there was in effect no meaningful trial strategy employed.

. This is not to say that there is any right of defendant or obligation of counsel to present a fabricated defense. (See, People v DeFreitas, 213 AD2d, supra, at 101.) Far from it. Better legal advice and more effective representation could and should have had the opposite effect.